Mr. O'Day, you may proceed. May it please the Court, Counsel. There are really two essential issues in this case. One issue is a discovery slash notice slash deemed admission of request to admit issue. The way that arose was that at the end of 2014 on New Year's Eve, a motion for summary judgment filed by our opponents was denied. On that day, then, it's in the record that we talked about starting depositions in the case given the denial of the summary judgment. Then the Thursday before President's Day in February, they purportedly sent to us requests for admissions, which didn't arrive until the day after President's Day. So they're saying the Thursday before the Monday is when they sent them out, and we got them the Tuesday, which was the day after President's Day. Pursuant to the usual methods, we stamped the envelope the day that we got it, the day after President's Day. Twenty-eight days later served our responses to the request to admit, only to have the other side claim that they were a day late because the assumption was that the mail was delivered on President's Day, on Monday, when no mail is delivered, and therefore our 28-day response was a day late. We asked the court below for permission to file a day late under Supreme Court Rule 183, and that was denied, and we claim that that was an abuse of discretion in light of the circumstances that were present here. Number one is the fact that there's no mail delivered, actually, on President's Day. Number two, we showed when we actually got it. Number three, the proof of service, well, we don't usually get involved in all these trying to be persnickety about a proof of service. It was defective under the applicable rules, and it said that the lawyer had placed it in the mail. We found out later that she had not done it. She had handed it off to a secretary and assumed that the secretary then had mailed it. There was no time in the proof of service, and on the particular envelope that we received with the request to admit in them, there was a stamp from a postage machine that showed the date of the Thursday before President's Day as being the date that it was run through the postage meter, but there was no postmark from the post office. Now, under the rules, they're required to put, in order to trigger a four-day period, they're required to put it in the hands of either a post office or a post office box, and they're in the same city as we are, Peoria, Illinois. We didn't get it on Friday. We didn't get it on Saturday. We didn't get it Sunday or Monday because those were days there was no delivery. We didn't get it until Tuesday, and so not only did we ask for one day of grace, which we were denied and which we say constitutes an abuse of discretion under these circumstances, we also asked to strike the proof of service because in this circumstance, it was wrong about who it said did something. It didn't say anything about putting it in a post office box or a post office, and for that matter, in a city the size of Peoria, mail sometimes takes a long time, but we didn't get it either Friday or Saturday. So on that issue, we're asking the court to rule that it was an abuse of discretion and or the notice doesn't count and so you should go from the actual time of service rather than the legal fiction of the request to admit being served on President's Day. It may not matter to the decision on the summary judgment issue because the judge, Judge Mack Below, said that he wasn't even relying on the request to admit when he made his ruling. That was within minutes after he ruled that he wasn't going to allow the request to admit to be one day late, but that's what he said. He said he wasn't relying on the request to admit when he entered summary judgment for them, but the simple fact of the matter is that the summary judgment that was heard on New Year's Eve when it was denied was the same summary judgment motion that was heard then in April after we had served our request to admit answers on St. Patrick's Day, March 17th, and then the summary judgment was filed that day as well, which was 29 days after President's Day, 28 days after we actually got the request to admit. And then in April, they said, well, something's changed. The request to admit should be deemed admitted. There was no other change whatsoever between the two motions. And so if Judge Mack says he's not going to consider the request to admit, he's really sort of reversing himself on what he ruled on New Year's Eve with respect to the same motion. That ruling in April, whether you regard it as including the request to admit responses or not, was to grant summary judgment on a matter that we contend should have been left for a trial. There were a lot of moving parts here. There's the moving part, if you look at page 822 of our opponents' supplemental appendix, there's a color drawing of the different parcels or color photograph of the different parcels in question. And you'll see that the northerly parcel is this parcel 4 that the parties are arguing about. There's a parcel to the left, a parcel 4, that's also owned by the Holmeses, but that's not the subject, that triangular piece. The only thing that's involved here is the actual parcel 4 itself. You'll see on the colorized photograph that there's three parcels, 1, 2, and 3, and you'll see that there's a building predominantly on parcel 3 that juts just a little bit into parcel 2. You can be deceived by this photograph a little bit because there's shade thrown off of the building to sort of make the building look bigger, but you can see the cars that are parked in the shade, and so you know that's not part of the building itself. And then parcel 1 doesn't have any building on it. Kathy Goldstein was the, or is, the daughter of the now deceased Fred Rump, and she has an affidavit that we have reproduced at age 158 of our separate appendix, and in her affidavit she not only says what her observations were, but she attaches different documents that she had for some reason with respect to these premises. On the third page of the documents she attaches, this is at page C441 of the record, and page A162 of our separate appendix, it lists the different tenants that are involved in renting this property out, and it shows that there are at least 15 different tenants that occupy this building at the same time, and it's also shown at the very end of that listing of the tenants at that time, someone named Gary Worley who submitted an affidavit in this case that was relied on by our opponents, who said he mowed the lawn, showing that he's not even there for the months of January, February, and March, and it looks like there's a proration for April, so in terms of when he was there to be doing anything, we think this document somewhat contradicts his affidavit. When we received the affidavit of Stephen Rump... Well, not being present in February, March, and April, how would that refute his affidavit that he mowed grass? I think it would, even though those would be months when you usually don't mow grass, it shows, I think, that he just got to the building in April of 2005, and so any alleged mowing of grass by him before 2005 would not have occurred anyway. Did all those tenants rent from Rump? They rented from... This time they were renting from the trust that owned it at the time. You can see that on page 160 of our supplemental appendix, where it says at the top, trust. So anyway, part of our moving parts here are the different tenants that are involved and the size of this building is large enough that there are multiple, multiple tenants. Another sort of moving part in this thing was the affidavit of Stephen Rump, where we went to work after we got that affidavit, where he said that the company went back to 1926. We showed from Secretary of State records that that wasn't true, that there were at least three different companies involved over that period of time. If you go back to the 1986, you'll find that one company ended, another company began on December 12th, and the title had been transferred a couple days before that. There's no indication that any grass was being mowed on that December 12th date or that anything else was going on. And here, the standard under Illinois law for adverse possession requires them to not have even one day of breakage in the period of time that they claim that land was adversely possessed. If there's one day when that doesn't happen, they have to start their 20-year clock all over again. Well, we went to work on this affidavit some more. Besides showing that he was absolutely wrong and was sort of trying to fudge or reverse-pierce his own corporate veil and say that companies didn't exist that had been created by them, that we showed that the title, by sending somebody over to the recorder's office, she did a complete title search and showed that where this affidavit claimed that the Rump Construction Company had had a title, that wasn't true, and we took it through the progression of who had had title. So we thought that we had shown that their affidavit was subject to dispute, and we thought that there should be a triable issue based on that alone. But in Kathy Goldstein's affidavit, which is, again, page 158 of the Supplemental Appendix, she said, importantly I think to raise an issue of fact here, she said that Fred Rump was her father. He had a corporation called George H. Rump Construction Co. When he retired in 1986, he conveyed the parcels to himself. Then subsequently he conveyed them to a trust. Then after that, her brother's corporation had rented from the trust, that importantly in paragraph 5 of her affidavit, that at one point her father had put footings in and started to build something in Parcel 4, but that he abandoned that project when he found out that he did not have title to that property. Are the footings still there? The footings are still there. You can see them on the Exhibit C. The parking lot is built up to the footings, that little portion of the parking lot that sticks into Parcel 4. And she said in her affidavit that the public used this. Well actually that makes total sense, because the county of Peoria had this parcel as a right of way to the state highway in its plat book. And it makes total sense that the public would have been using this all along. And you can see the way that it's situated adjacent to Harmon Highway, that that could easily be true. And sort of the highest and best use for this property is probably as a right of way, which may be why it's still important to people to possibly be sold to the state of Illinois someday. But our fallback position to that, even if you disagree or even if you agree with us that the summary judgment should not have been granted, but you think that we now ask what relief should have been entered, we think that only the portions where the parking lot sticks into Parcel 4 should have been regarded as adversely possessed, and not the open area where they said they mowed the grass, which is adjacent to grass in the right of way even on this drawing, that they shouldn't have gotten the whole thing. So those are our claims in this appeal. I'll come back on rebuttal and try to answer any questions I have. Thank you. Thank you. Mr. Jensen? May it please the court, counsel O'Day. My name is Dustin Jensen. I'm with the firm of Hasselberg, Rockbell, and Kuppler. I represent the plaintiff and appellee, Stephen Rump. And today we are asking that the court affirm the trial court's grant of summary judgment in favor of Mr. Rump. This case involves a claim of adverse possession for Parcel 4, which opposing counsel did a good job of describing where it's at and where it's situated. The facts of this case that are undisputed is that in 1980, my client's family business, Rump Construction, completed construction of a parking lot that sits on the majority of Parcel 4. The parcel has not substantially changed since 1980. The parcel has been used for the sole benefit of the building that are on the adjacent parcels 1 through 3, where Rump Construction is located. Also, since 1980, it's undisputed that my client, Mr. Rump, has maintained the entirety of Parcel 4 via snow removal and lawn care. Now, the building on Parcel 1 through 3, there was some talk about the chain of ownership. In 1980, when at least the adverse possession began, Rump Construction owned all of Parcels 1 through 3. In 1986, Rump Construction deeded those parcels to my client's father, Fred Rump. In 2004, my client's father deeded those parcels to his family trust. In 2010, the family trust deeded those parcels to my client, Mr. Rump. Are you saying Parcels 1 through 3? Parcels 1 through 3. But I would submit that since 1980, Parcel 4 has been counted as an extension of Parcels 1 and 2 on that map. Does it show that on the deeds? No, it does not. However, since 1980, it's undisputed that the parking lot has taken up the majority of Parcel 4, which was constructed by Rump Construction, and that my client, Mr. Rump, has maintained the entirety of Parcel 4 via snow removal, lawn care maintenance, or hiring contractors to do the same job. Now, importantly, the true title holders, the appellants in this case, Thomas and Heather Holmes, admitted, and I'm not referring to the request to admit that Mr. O'Day talked about in his appeal, in interrogatories and requests to produce, they admitted that they did not know about their title until June 2011. This is 31 years after the possession began. They only claimed possession. When we asked them to state how they possessed the property, they claimed taxes. They paid taxes, which we pointed out that, is not appropriate to defeat a claim of adverse possession when adverse possession is claimed by the 20-year possessive statute. And finally, when we asked them to say, well, fine, show us the taxes that you did pay, and we asked for all records of taxes that they paid, they only supplied us with taxes from 2013 and did not explain why they could not give us records of taxes from prior to 2013. As we pointed out in our brief, permanent masters, that's an admission that they did not pay taxes prior to 2013. And Counsel O'Day indicated that there was no change in the record from the first motion of summary judgment to the second, other than the request to admit. That's simply not true. On page C547 of the record, it's also in the appendix A241, that's where this request to produce was responded to and received by us, and the proof of service says it was in March of 2015. The first motion of summary judgment, the judge says, I think taxes are okay to show possession. We said, well, show us when you paid taxes. They couldn't show us that they paid taxes prior to 2013. That was the change from the first motion of summary judgment to the second. Now, it's our contention that the foregoing establishes adverse possession by Rump, my client, and his predecessors entitled to parcels 1 through 3. In order to show adverse possession, you must show five elements, continuous possession, hostile and adverse possession, actual possession, open, notorious, and exclusive possession, and possession under a claim of right inconsistent with that of the true owner. As discussed in our brief, we believe that the construction of the lot in 1980, the sole use of that lot for the benefit of the building on parcels 1 through 3, as well as the maintenance of the entire parcel 4, the lot and the grassy area, established actual possession, open and notorious possession, and possession under a claim of title inconsistent with the rights of the true owner. That leaves the continuity, exclusivity, and hostile or adverse as items that opposing counsel has pushed back on. With respect to continuity, as we've noted, it's undisputed that Rump Construction has possessed the lot via the building of the lot and maintenance of the entire parcel since 1980. After 1986, Rump Construction began doing these duties as a tenant for the owners of parcels 1 through 3, which was my client's father, then my client's father's family trust, and then now my client. And the Illinois case law is clear that you can tack possessions together to meet the statutory period. They're also clear that tenants can adversely possess property for their landlord. The Holmes's claim that despite this possession, that there's an error in the deed to my client that makes his possession not tacked to the possession of the predecessors in title. As we pointed out, the Conveyance Act shows why their claimed inconsistencies are untrue. They claim that notaries in other states cannot notarize deeds for Illinois property. And the Conveyance Act simply says that's not true. It has a whole section for notarizations from notaries in other states. The case they rely on is a 1909 appellate court, not Supreme Court case, that involved an affidavit for an amended information in a criminal case. To the effect that a 1909 appellate court case could have some bearing on this case, the Conveyance Act wipes that out. And the Conveyance Act says that how these were deeded is proper. Regardless, even if there is an issue in the deed, Hermes v. Fisher and Falloon v. Simshawshire, which we cited in our brief, indicate that in order for tacking of possession, you don't need a deed. All you need is the intent to pass your rights to the next individual, as well as actual possession by that individual. In this case, it's clear that since 2010, Ms. Rump has been seen as the owner of Parcels 1 through 3 and the possessor of Parcel 4 via that ownership. Excuse me just a minute. If you're claiming that the adverse possession began in 1980, is that correct? At least 1980. Okay. Then the 20-year period is up in 2000? 2000. Why are we dealing with 2010? What happened was in 2010, when the trust deeded the Parcels 1 through 3 to my client, the recorder or someone found out that this Parcel 4 was not included and it became an issue at that point. But the adverse possession was already finished at that point, was it not? Correct. And so there were some negotiations. This is, I don't believe in the record, but negotiations regarding we'll pay you some money for this Parcel 4 to make it clear. That was not, they refused, the title owners refused, and so we filed this complaint to perfect the adverse possession. But, yeah, the adverse possession had occurred 10 years prior to this. No one just realized it was an issue. Which brings me to the next element of hostility and adverse. Opposing counsel have claimed that you can't have hostile possession where there's a vacant, unenclosed land. As we point out in our brief, when the actual owner of the land does not know that they own the land, it cannot be permissive possession because you cannot permit someone to use land that you are not aware that you own. So we've also established hostile and adverse possession. With respect to exclusivity, we noted that exclusivity does not mean you need to keep everyone off of the land. It means that you have to possess the land in the manner in which the land should be possessed. This is a parking lot for a building that has residential tenants, business tenants, and road construction. Of course, members of the public are going to park in that parking lot because they are customers to the tenants. And as I noted earlier, tenants can adversely possess for their landlord. And what's important is this was exclusive to the possession of the Holmeses. The Holmeses, as I noted, admit they didn't know they had title until 2011, only claimed a possession as taxes after 2013. With respect to the, well, even if you give them the parking lot, you can't give them the grassy area, they cite two cases for the proposition that loaning of grass alone generally is insufficient to establish adverse possession. And both of those cases are distinguishable from the current case. The first case, Jubilee v. State of Illinois, stated that loaning of grass alone generally is insufficient, but then went on to deny adverse possession because it found that the possession was permissive. As I noted earlier, in this case, the possession could not have been permissive because the actual title owners did not know that they held title. The Jubilee case cited Niterauer v. Poli. And in that case, the court held that under the circumstances of that case, mowing grass alone was not sufficient to establish adverse possession. And under the circumstances of that case, they found that because they found that the individual was not mowing the grass under a claim of right, or a claim of title. In this case, it's clear that the maintenance of Parcel 4 has been under a claim of title since at least 1980. This court, the 3rd District in 1990, decided Wandless v. Rape. That case is much more analogous to this case. In that case, there was a claim for adverse possession, and they built a concrete structure on the disputed portion of the land and then mowed the remaining portion of the land. In that case, this court said that there was adverse possession for that mowing, and they didn't say this, but the implication is, is that when you improve a land and then you maintain the rest of it, that's adverse possession. It doesn't make sense that you have to put concrete on every portion of the parcel. If you look at that map on A22, the majority, I would say probably three-quarters or more, is taken up by the parking lot. The remaining was mowed. So there has been possession of the entire land via the parking lot as well as maintenance since 1980. Now, opposing counsel started off discussing the request to admit, and we've done a pretty thorough job briefing why we believe that the Bernier case says that our proof of service was correct and why the statute of statutes that says when you need to do something, if you need to do it on a weekend or a holiday, that gets extended to the next workday, does not apply to a statute that says the effective day, when something becomes an effect, that it doesn't push that to the next workday. And what we point to is that the statute says in other forms of service, let's say fax service, for example, it is the first business day that you get the fax. When it talks about mail, it doesn't have any qualifier. It just says four days. How do we know this document was mailed? By the proof of service. But there's no postmark. I'm sorry? There's no postmark. Correct, but by the proof of service, that's the proof that it was mailed, and there's no evidence that it wasn't. They have not provided any evidence that says it wasn't mailed on that day, so the proof of service constitutes a prima facie case that it was mailed on that day. Now, if you take their argument to its logical effect, any document mailed on a Wednesday, the effective date of service is on a Sunday, but they would say, no, you always have to push it back to Monday. Well, that's not how the world works. When you get a document that's mailed on Thursday, the effective date of service is on that Sunday, and they don't push it back because court's not open that day. Regardless, what I'd like to stress is that we're asking the court to affirm the trial court's finding of summary judgment in favor of my client, Mr. Rump, and regardless of the court's finding on the request to admit, because the Holmes is admitted via interrogatory and request to produce, that they didn't know they had title of land until 2011 and never possessed the land except for paying taxes on 2013, 13 years after adverse possession had taken hold, that even if the court does disagree with the trial court on the request to admit issue, it's not sufficient to overturn the court on its overall finding of summary judgment. Thank you very much. I have a question for you. Yes. You focused on your theory that it can't be permissive based on the case law because the true owner didn't know they owned it. So it's kind of an impossibility theory that it's impossible for them to give permission because they don't know they own it. Doesn't the flip side of that argument work against your client? In other words, their possession couldn't be adverse because they didn't know who owned it either. The cases indicate that for adverse possession there does not need to be ill will. We cited that in our brief. But I don't think there has to be knowledge of who the owner is. So what I'm wondering is nobody knew who owned the property. The person claiming it now and the person that owns it didn't know they owned it. So doesn't the 20-year statute for adverse possession, the 20-year period, begin on the date that ownership was determined? Was it 2010? 2010, yeah. I would submit to you that the case law says no. The case law says possession is all that matters. And if you're possessing it under a mistaken belief that you own it, which was the case here, then that starts the clock for adverse possession. I mean, it's continuous, adverse, actual, open, and with claim of title. There's no knowledge requirement there. It's all about your physical possession and what people in the community construe you as being the owner of that property. Thank you very much. Thank you, Mr. Jensen. Mr. O'Day, rebuttal. Here it's our position that there was no adverse or hostile possession because people thought that that was right-of-way to the state highway and it was used accordingly. You can have people who, if I've got a street next to my house and I happen to mow next to the street, that's not adverse and hostile if I'm mowing in an area that's owned by the municipality or the state of Illinois. You put a parking lot on it. Well, he did put a parking lot in there, but Kathy Goldstein's affidavit establishes that at some point he found out he was not the record title owner and that after that he stopped using it and stopped doing any more construction on it, had footings in the ground. This guy's a contractor, put footings in the ground and stopped building. So this case has sort of always been troublesome for us because we think that the other side is treating it sort of like a case of primogeniture or something where what Steve Brown, the brother, does or wants to do since 1980 counts just towards him and never towards their father, their father's company, their trust, or anything else. Everything's him doing it. If under the tacking cases, which we've cited on page 8 of our reply, Mann and DeBow, in order to come up with tacking of owners and adverse possessors, they have to show every step of the way who's involved in having this adverse possession. So if it's Fred Grumpf, the father, who's now deceased, if he's doing it, they have to show, well, how did he do it? Did he do it through tenants? Did he do it through himself? Same thing with the trust. There's been some discussion, I think, in both briefs, but the Knopf case where the trustees actually formally possessed property and that was felt to be sufficient for adverse possession. But here all we have is evidence, references to a trust that owned it without regard to any of the trustees or a majority of the trustees or, for that matter, anybody else on behalf of trustees doing anything. And so it's been our contention all along. We facetiously at one time called it one big ball of runt, but that's sort of the way that they have treated the thing without making the fine points about which corporation or trust owned it or individual, which tenant were they acting through. Why would Grumpf Construction be the main tenant? Why would they be conserved? Just because he owns the construction company for five or six years? Does Stephen have siblings that could raise these same issues? Yeah, and Kathy Goldstein is one of those siblings. There were three sisters and one brother, and in this proof he just sort of majestically proclaims in his affidavit, well, I've done this since 1980, and that's when we had to go to the public record of the Secretary of State and through the recorder's office and say, it's not you. This is not, you know, common law England. We actually have corporations. We actually have trusts. We have different versions of Grumpf Construction in the corporation section of the Secretary of State's office, and you don't get to just say, well, it's me, the oldest brother. We also, with emphasis on the request to admit issue, we believe that the proof of service is, in fact, effective. They just said that it wasn't, but when the case was argued in April for the second go-round on the summary judgment, Ms. Shoff admitted that she was not the one who put it into the mail, that she handed it off to a secretary, and so the proof of service, the rules say that you've got, if you're a non-lawyer, you've got to file an affidavit. If you're the one that puts it into the mail, if you're a lawyer, you don't have to. You just sign that you did it. Here, she signed that she did it, but she didn't. Can you address my concern about this impossibility theory? Do you have to know, or is the true owner relevant to adversity? In other words, there was a belief the true owner was the state. And I believe that at some point, Mr. Fred Rump knows that he's not the true owner, because at least in terms of a summary judgment and whether there should be a trial, Kathy Goldstein, who was Kathy Rump before she was Goldstein, she says her father found out he was not the title owner, and so I don't think this is adverse, hostile. I think you're right. It's sort of an impossibility thing. He doesn't think he's the owner. He doesn't know that our clients are the owner. Our clients don't know that they're the owner. Everybody thinks it's the state. He treats it the same way that you would treat a right-of-way in front of your house or your business, because you might go ahead and mow the lawn if you don't think the state's mowing it well enough, and that's our point. You argue that he abandoned the construction project, which is indicative that he knew he didn't own it, but there is another side of that argument that he left the footings there, so that was a continual assertion of an adverse interest. So how would you address the fact that he did not remove the footings? Well, Kathy Goldstein, in contrast to her brother, she said that he meant to abandon it, that that's what he was doing when he stopped building. And he is a contractor. It's not like me stopping to go lay on the couch or something after I get the footings in. This guy's a contractor, and so it's really quite an event when he stops building after he gets the footings in. Thank you for answering my question. The question that I have regarding that is I know that she asserts that he knew that he was not the owner, but she also asserts, and I'm trying to look again for the affidavit, that he understood it was a mistake to be the owner or just understood that he was not the owner? I believe she said that he understood that he was not the owner. She says, this is our supplemental appendix, page 158 is where her affidavit is. She says that he was her father, never used exclusively by her brother's corporation, and that at the bottom of the first page of the affidavit, once he determined that he did not own SANE, he stopped installing the footings, he was going to be building a building and he stopped, and that he never tried to get rid of anyone else. The public did use it, including her, including Mrs. Goldstein, and that she never saw him use the paid area again. I would point out that in the color photograph that we were looking at, that's part of the appendix that they submitted at page 822 of their appendix, that that photograph was taken apparently on March 25, 2014. It's indicative of the way the property looks. There are cars parked in that little area at that time, but that doesn't prove that Mrs. Goldstein was wrong about the area not being used, as she sets forth in her affidavit. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. And right now we'll take a short recess.